UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN


**CHARLES DeJARNETT**
    Plaintiff

**v.**                                                                                                             **No. 1:10CV-00127-M**

**MICHAEL ASTRUE**
    Commissioner of Social Security
    Defendant


**MAGISTRATE JUDGE'S REPORT**
**and RECOMMENDATION**

This matter is before the court upon the plaintiff's complaint seeking judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). The plaintiff is represented by Julie Atkins. The fact and law summaries of the plaintiff and the defendant are at Docket Entry Nos. 14 and 17, respectively. In addition, the plaintiff has filed a reply (Docket Entry No. 18). This matter has been referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636.

The final decision of the Commissioner was rendered on November 3, 2009, by administrative law judge (ALJ) Anthony Smereka. In support of his decision denying Title II and Title XVI benefits, Judge Smereka entered the following numbered findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since March 22, 2007, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairment: borderline intellectual functioning, diabetes mellitus, residuals of knife wounds to the chest and abdomen, and substance abuse in remission (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels. The claimant's retained mental capabilities include at the least: understanding, remembering and carrying out simple instructions; making judgments that are commensurate with the functions of semiskilled work; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting.

6. The claimant is capable of performing past relevant work as a general factory helper (DOT No. 529.696-034) or as a janitor (DOT No. 381-687-018). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from March 22, 2007, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Administrative Record (AR), pp. 12-25).

**Governing Legal Standards**

1. The court has jurisdiction to examine the record that was before the Commissioner on the date of the Commissioner's final decision and to enter a judgment affirming, modifying, or reversing that decision. 42 U.S.C. § 405(g), sentence four. In exercising its "sentence four" jurisdiction, the court is limited to determining whether the Commissioner's controlling findings are supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his decision. *Richardson v. Perales*, 402 U.S. 389 (1971). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kirk v. Secretary*, 667 F.2d 524 (6th Cir., 1981). It has been described as a sufficient amount of evidence "to justify, if the trial were to a jury, a refusal to direct a verdict." *Sias v. Secretary*, 861 F.2d 475, 480 n. 1 (6th Cir., 1988). In determining whether the Commissioner's findings are

supported by substantial evidence, the court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. *Wyatt v. Secretary*, 974 F.2d 680 (6th Cir., 1992). However:

> The substantial-evidence standard allows considerable latitude to administration decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interferences by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.

*Mullen v. Secretary*, 800 F.2d 535, 545 (6th Cir., 1986).

When conducting substantial evidence review, the court is restricted to a consideration of the evidence that was before the Commissioner on the date of the final decision. When the Appeals Council declines to review the ALJ's decision and render a new decision, the ALJ's decision becomes the Commissioner's final decision. *Cotton v. Secretary*, 2 F.3d 692 (6th Cir., 1993).

2. To be entitled to disability insurance benefits (DIB), a claimant must be under the age of 65 years, must meet the insured status requirements of Title II of the Social Security Act, and must be under a disability as defined by the Act. To qualify for supplemental security income (SSI) benefits, a claimant must file a Title XVI application, must have insufficient earnings and other financial resources, and must be under a disability as defined by the Act. The determination of disability is essentially the same for Title II and Title XVI purposes.

3. Disability determination is a five-step sequential evaluation process, to-wit:

**STEP #1** The claimant must not be engaged in substantial gainful activity.

**STEP #2** The alleged disabling impairment must be "severe."

3

**STEP #3** If the claimant has a medical condition that meets or exceeds the criteria for an impairment defined in Appendix 1 of 20 C.F.R. Part 404, Subpart P of the regulations ("the Listing"), a conclusive presumption attaches that the claimant is disabled.

**STEP #4** The claimant must not be able to perform his past relevant work either as he actually performed it or as it generally performed in the national economy.

**STEP #5** If the claimant makes a <u>prima facie</u> showing that he cannot perform his past relevant work, the burden of going forward with evidence shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform. *Born v. Secretary*, 923 F.2d 1168 (6th Cir., 1990).

## **Listing 12.05C**

An individual with the following medical impairment, described in the so-called Listing of impairments of Appendix 1 of the regulations, is entitled to a conclusive presumption of disability:

> *12.05 Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> ...
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

The plaintiff was born on April 14, 1962 (AR, p. 427). His school records indicate that, on December 16, 1977, when he was 15 years old, he had a verbal IQ of 69, a performance IQ of 79, and a full-scale IQ of 71 (AR, p. 247). On August 20, 2007, at age 45, he was examined at the request of the Commissioner by Steve Webne, Ph.D. He obtained a verbal IQ of 65, a performance IQ of 75, and a full-scale IQ of 66 (AR, p. 431).

In his written decision, the ALJ concluded that the "test results of August 20, 2007, [do not] validly reflect the claimant's intellectual capacity [because] Dr. Webne noted that the claimant may have scored higher if he made a more concerted effort" (AR, pp. 18 and 431). The ALJ further opined as follows (AR, p. 18):

> [T]he scatter within the subtest results ranged from a scaled score of 2 in picture completion to 45 in digit symbol coding. Scatter within the claimant's subtest results is indicative of emotional or other interference in the claimant's IQ test results which often indicates that an examinee's test results do not reflect their true intellectual functioning.

The magistrate judge submits that Dr. Webne was in a better position than the ALJ to interpret the validity of the clinical test he administered. Dr. Webne concluded as follows:

1. The plaintiff made a "fair effort" and his ability to "recall 11 of the Rey items ... is not consistent with malingering" (AR, p. 431).

2. The test results may be a "very slight underestimate" (AR, p. 433). Nevertheless, "[o]n 95 out of a hypothetical 100 re-administrations ..., the claimant's Full-Scale IQ would be between 63 and 71," well within the Listing (AR, p. 432).

3. The plaintiff "currently is being diagnosed provisionally with mild mental retardation. The possibility of borderline intellectual functioning needs to be ruled out in this case" (AR, p. 433).

In *Tingler v. Astrue*, 2008 WL 4238950 (N.D.W.Va.), the psychologist appears to have applied the clinical label of "mild mental retardation (provisional)" as tantamount to a finding that, while the IQ scores are valid, other potential issues remain such as a lack of previous psychological evaluation indicating onset prior to age 18. In this case, according to the plaintiff, Dr. Webne was unaware of the plaintiff's IQ results when he was 15 (Docket Entry No. 18, p. 5). We conclude that the substantial weight indicates that Dr. Webne believed his test results were valid. More

5

specifically, Dr. Webne stated that, while the test results may be a very slight underestimate in light of the possibility of a more concerted effort, on 95 out of a hypothetical 100 re-administrations, the plaintiff's full-scale IQ would be expected to be well within the Listing.

The Commissioner has not argued that the plaintiff has failed to satisfy the requirement of having a "physical or other mental impairment imposing an additional and significant work-related limitation of function." For completeness sake, we note that the plaintiff's manipulative impairment, discussed below in a separate section of this report, satisfies the requirement.

### **"Introductory Paragraph" Requirements**

Next, the ALJ found that the plaintiff does not satisfy the Listing because be does not meet the so-called "introductory paragraph" requirement, to-wit:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The ALJ found that the plaintiff failed to show that his intellectual impairment "manifested during the developmental period." Specifically, the plaintiff allegedly did not prove that the IQ test results that are part of his school records were valid and that there is no indication that he was enrolled in special educational classes while in school (AR, p. 18). The magistrate judge submits that it is neither reasonable nor realistic to expect that, in addition to administering, recording, and preserving IQ test results for each pupil, the public schools should maintain proof of test score validity in each case. On August 20, 2007, the plaintiff reported to Dr. Webne that he took special education classes (AR, p. 429). We conclude that the plaintiff has adequately established that his intellectual impairment "manifested during the developmental period."

6

Finally, the ALJ found that the plaintiff failed to establish "deficits in adaptive functioning" in light of the fact that he "has lived independently, raised children, and worked almost continuously from 1984 through 2007, with the exception of five years in which he was incarcerated" (AR, p. 18). The ALJ's own findings as a whole appear to belie the foregoing finding of no deficits in adaptive functioning. According to the ALJ, the plaintiff is "unable to write checks, pay bills, create a grocery list, or shop from one ... he has a history of anti-social behavior including an arrest and incarceration for possession of cocaine" (AR, pp. 18-19).

In *Brown v. Secretary*, 948 F.2d 268, 270 (1991) (quoting from the DSM), the Sixth Circuit had occasion to remind the Commissioner as follows:

> By their late teens [individuals with mild mental retardation] can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support.... At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes ....

The plaintiff's earnings record from 1984 through 2009, reflects low earnings. His highest earnings were in 2006, when he reported earnings of $10,588 (AR, p. 176). The VE testified that the plaintiff's past relevant work was unskilled as performed (AR, p. 79). We conclude that the plaintiff has adequately established that his intellectual impairment results in deficits in adaptive functioning. Therefore, the substantial weight of the evidence indicates that the plaintiff's mental impairment satisfies all of the criteria of Listing § 12.05C.

## **Manipulative limitations**

The plaintiff also suffers from hepatitis C with complaints of pain and cramps affecting his hands and fingers (AR, pp. 427-428). The ALJ found that the plaintiff has no exertional limitation. Finding No. 5. The vocational hypotheticals contemplated no manipulative or other physical restriction.

The following exchange occurred at the administrative hearing (AR, p. 49):

*ALJ:* Okay, I'd like you to explain to me what kind of problems you're having today in doing anything. Like for example, what's your number one complaint or number one problem?

*Plaintiff:* My hands.

*ALJ:* That would prevent you from working? Your hands? What kind of problems are you having with your hands?

*Plaintiff:* They cramp. I can't open them and close them. They cramp real bad.

On March 24, 2009, the plaintiff's treating physician, Yoo T. Suh, opined, among other things, that the plaintiff is restricted to occasional fine manipulation (i.e., fingering) and occasional gross manipulation (i.e., handling) of the right hand and "never" in the left hand (AR, p. 596). The plaintiff is right-hand dominant (AR, p. 85). Dr. Suh's stated basis for this opinion was as follows (AR, pp. 597 and 698) *(emphasis added)*:

> Pt. has Chronic Hep C and he couldn't tolerate medications because of the side effects from that such as the vision problems, also pt. experiencing some abdominal pain and **edema in legs, feet, and hands.** Pt. expresses concerns about pain with long period of time on his feet, and also had **problems with his hands.** If the pt. is experiencing anything else other than what is listed above, he needs to consult his primary care physician.

According to the plaintiff (Docket Entry No. 14, p. 8):

> [P]ain associated with hepatitis C is recognized to be primarily abdominal pain and pain in the small joints of the hands, ankles, or wrists. www.hepatitis.va.gov. Further, the federal government has documented that sixty four percent of patients who are, as here, taking medication interferon, report myalgias [i.e, muscle pain] as a side effect of the medication.

While we decline to "play doctor," our legal research is entirely consistent with the plaintiff's assertions. A simple Westlaw search conducted this day revealed 24 cases in which a hepatitis C claimant was found to be restricted to occasional fingering and handling. (ALLFEDS: "Hepatitis C" & Occasional! /s Fingering /s Handling). Furthermore, these 24 cases mention myalgias and muscle pain with some frequency. For example, in *Chuculate v. Barnhart*, 2006 WL 637163 (10th Cir.), "Dr. Wickwire said that within the month plaintiff was going to start a year's treatment with ribavirin and interferon, which would have side effects of myalgia (muscle pain), low grade fevers, and chronic fatigue."

The Commissioner argues that whether takers of interferon suffer myalgias is irrelevant to this case because in March of 2009, Dr. Suh took the plaintiff off interferon (Docket Entry No. 17, p. 6, citing AR, pp. 584-585). The argument is unpersuasive because, as noted above, Dr. Suh opined manipulative limitations in March of 2009, being fully aware that the plaintiff had been at least temporarily taken off interferon, to-wit, "Pt. has Chronic Hep C and he couldn't tolerate medications because of the side effects from that such as the vision problems" (AR, pp. 597 and 698). Perhaps Dr. Suh's clinical rationale was that, because the plaintiff was experiencing serious side-effect of the medication and his viral load was undetectable in March of 2009 (AR, p. 570), it made sense to take him off the medication until such time as his viral load increased to a certain level; thereafter, the medication and manipulative limitations would be

expected to resume. Another possibility is that manipulative limitations are associated with hepatitis C itself. In any event, our role is to defer to Dr. Suh's medical opinion, rather than try to second-guess him or "play doctor" as the Commissioner appears to do.

In his written decision, the ALJ appears to have discounted any manipulative limitation on the supposition that the plaintiff's complaints, if valid, should be based on the presence of osteoarthritis of the hands, yet "there are no radiological studies which support any diagnosis of osteoarthritis or other degenerative process of the bones, joints, or otherwise as to the hands" (AR, p. 16). On the contrary, the type of pain the plaintiff was experiencing appears to have been muscular. The magistrate judge concludes that the ALJ failed to identify "good reasons" for rejecting the treating source's medical opinion. 20 C.F.R §§ 404.1527(d)(2) and 416.927(d)(2). The next question is whether the treating physician's opinion was entitled to controlling weight.

The so-called "treating physician" rule states that a treating source's medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." Id. We conclude that Dr. Suh had a well-supported clinical basis for opining manipulative limitations. Furthermore, there does not appear to be any substantial medical or non-medical evidence that is inconsistent with the presence of said limitations. Therefore, Dr. Suh's finding that the plaintiff is restricted to occasional fingering is entitled to controlling weight.

Having rejected Dr. Suh's opinion, the ALJ appears to base his finding of no manipulative limitation upon the findings of a one-time examining source. On September 12, 2007, Amir Harandi, M.D., examined the plaintiff at the request of the Commissioner. In his narrative report, Dr. Harandi repeatedly noted the plaintiff's complaints of "pain in his hands and his fingers"

10

(AR, p. 437). Dr. Harandi observed that the plaintiff exhibited "no limitations on range of motion exercising ... wrists, fingers [and] has normal grip strength ... does not have any evidence of arthritis at this time on exam" (AR, p. 438). Dr. Harandi concluded that "As far as on physical exam, the patient has no limitations in his ability to perform activities that would involve ... lifting and handling objects ... as well as carrying objects as he has normal grip strength" (AR, p. 439).

In other words, according to Dr. Harandi, because the plaintiff exhibited normal range of hand motion and grip strength on September 12, 2007, his complaints of ongoing pain in the hands and fingers may be discounted in their entirety and a finding of no manipulative limitation is appropriate. The magistrate judge submits that this is precisely the type of myopic logic that the "treating physician" rule was designed to avoid. "Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examination, such as consultative examinations...." Id. Dr. Suh's finding that the plaintiff is restricted to occasional fingering with the right hand is entitled to controlling weight.

**The Remedy**

The vocational expert (VE) testified that an individual with the significant mental limitations acknowledged by the ALJ (Finding No. 5) who also is restricted to occasional fingering with the right, dominant hand would be unable to perform the plaintiff's past relevant work or any other job that exists in significant numbers in the national economy (AR, pp. 85-86). The magistrate judge concludes that all essential factual issues have been resolved and the record adequately establishes

11

the plaintiff's entitlement to benefits.  See *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir., 1994). Our conclusion that a judicial award of benefits is warranted is independently supported by our finding that the substantial weight of the evidence shows that the plaintiff's mental impairment satisfies all of the criteria of Listing § 12.05C.  See *Purvis v. Astrue*, 2010 WL 1258218 (S.D.Ohio) (awarding benefits pursuant to Listing § 12.05C and *Faucher*).

## RECOMMENDATION

The magistrate judge RECOMMENDS that this matter be REMANDED to the Commissioner for calculation and payment of past-due Title II and/or Title XVI benefits.

**NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, any party shall have a period of fourteen (14) days, pursuant to Fed.R.Civ.P. 6(a), from the date of notice of electronic filing within which to file written objections to the foregoing report with the Clerk of the Court. Further and pursuant to Fed.R.Civ.P. 72(b), any party may file a response to objections filed by another party within fourteen (14) days after being served with a copy of said objections. A period of three days shall be added to each fourteen (14) day period above pursuant to Fed.R.Civ.P. 6(d), for a total of seventeen (17) working days.

The court shall not conduct a de novo review of objections that are general, conclusory, or merely adopt previous pleadings. The original objections shall be sent to the Clerk of Court either electronically or by mail. A copy of any objections and response thereto shall be served on the undersigned at Suite 330, 501 Broadway, Paducah, Kentucky, 42001 or via e-mail to w_david_king@kywd.uscourts.gov. Failure of a party to file timely objections shall constitute a waiver of the right to appeal by that party. *Thomas v. Arn*, 474 U.S. 140 (1985).